**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

ANGEL MEDRANO,

Petitioner,

v.

MAURICE JUNIOUS,

Respondent.

_____________________________________/

1:11-cv-01662-LJO-DLB (HC)

FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS

[Doc. 1]

Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

PROCEDURAL BACKGROUND

The Tulare County District Attorney charged Petitioner with murdering Henry Cryder (Cal. Pen. Code,[1] § 187(a)), attempting to murder Kenny Williams, Charles Marshall, and Beau Bramlett (§§ 664, 187(a)), assaulting Elizabeth Perez with a deadly weapon (§ 245(a)(2), and kidnapping Jose and Alberto Perez (§ 207(a)). Each count included sentencing enhancement allegations based on Petitioner's use of a firearm during the commission of the crimes (§§ 12022.3(a)(1), 12022.53(b) & (d)). (LD 1.)

Five days before the trial was scheduled to begin, Petitioner's counsel filed a motion to suspend proceeding on the ground he was incompetent to stand trial. (Id.)

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

The court held a bench trial to determine Petitioner's competency, and the court ultimately found Petitioner competent to stand trial.

Petitioner then pled no contest to all the counts and enhancement allegations, in exchange for an indicated sentence of 50 years to life. Petitioner was sentenced to prison for the indeterminate term of 50 years to life.

The California Court of Appeal, Fifth Appellate District affirmed the judgment, but remanded the case back to the trial court for the limited purpose of determining presentence custody credits.

The California Supreme Court denied review.

Petitioner filed the instant federal petition for writ of habeas corpus on October 4, 2011. Respondent filed an answer to the petition on December 7, 2011. Petitioner did not file a traverse.

## STATEMENT OF FACTS

The Defense Witnesses

> During the competency proceedings, two experts testified on [Petitioner's] behalf: Thomas Middleton, Ph.D., a psychologist, specializing in neuropsychology, and Albert Globus, M.D., a forensic psychiatrist with particular experts in Positron Emission Tomography (PET). These experts had originally been retained by defense counsel to evaluate defendant in 2007, and their evaluations had led to defendant's motion to withdraw his not guilty plea and to enter a plea of not guilty by reason of insanity.
>
> In their testimony, Dr. Middleton and Dr. Globus described the extensive testing undergone by [Petitioner], including a PET scan, which supported their assessment that [Petitioner] suffered from organic brain damage, resulting in severe impairment to his memory and cognitive thinking skills. Dr. Globus opined that the brain damage had been present since birth or sometime early in [Petitioner's] life, and that [Petitioner's] later use of controlled substances caused further brain damage. Although not mentally retarded, [Petitioner] functioned at a borderline level with an IQ of 78. While they did not originally assess [Petitioner] for his competency to stand trial, both defense experts agreed that the mental deficits they observed in [Petitioner] in 2007, were the types that would persist and render him currently incompetent to stand trial.
>
> In addition, Dr. Globus evaluated [Petitioner] for his competency to stand trial in May 25, 2008. Dr. Globus testified that [Petitioner's] "memory defect first and foremost and also his poor cognitive ability . . . point strongly to his inability to be able to do the mental manipulations or the mental functions that are necessary to competency, that is to rationally assist his attorney in the preparation of his defense and advise the attorney about what is happening in the courtroom." Dr. Globus explained: "One requires a certain vocabulary, a certain educational

level, a certain knowledge of the different roles, social roles of the people in the court, and the capacity to follow the line of questioning and keep in memory the pertinent facts and to manipulate those thoughts to produce some sort of commentary that would help you in his defense." Dr. Globus concluded: "I think that is well beyond [Petitioner's] capacity even when totally sober."

Dr. Middleton reached a similar conclusion, testifying that [Petitioner] "likely has substantial defects that would interfere with his ability to follow the courtroom proceedings." Dr. Middleton explained: "In a courtroom environment there are multiple parties speaking, there's information that has to be absorbed and integrated and the speed of which that is needed is reflected not only in the memory test, but also in the tests of executive functions." Although "[i]n a quiet room with repetition [Petitioner] can follow and absorb information[,] . . . his executive functions become the limiting factor in a courtroom where it's fast-paced, there's . . . multiple stimuli and he has to be able to show processing that would be able to keep up with that. He simply isn't able to do that." Dr. Middleton explained that while [Petitioner] was able to absorb some information, he was unable "to integrate and apply that information" and was not "able to understand the proceedings against him." Dr. Middleton concluded: "Based on my comprehensive neuropsychological evaluation due to his dementia as well as his psychotic disorder, as well as his post-traumatic stress disorder, he simply doesn't have the rational capacity to participate meaningfully in his defense."

The Prosecution Witnesses

One expert testified for the prosecution: Paula Willis, Ph.D., a clinical psychologist, whose "experiences have all been in the focus areas of corrections and forensic work." Dr. Willis testified that since 2000, she had conducted approximately 200 competency evaluations and had previously qualified as an expert in the field.

Dr. Willis was "asked to do a 1368 evaluation of [Petitioner]." As a result of her evaluation, Dr. Willis concluded that [Petitioner] was competent to stand trial. Dr. Willis described the various components of the evaluation, which began with a face-to-face clinical interview at the jail. She also reviewed the reports of Dr. Globus and Dr. Middleton, as well as those of Dr. Bindler and Dr. Velosa, whom the trial had appointed to evaluate [Petitioner] on the question of sanity pursuant to sections 1026 and 1027. [FN 3] In addition, Dr. Willis conducted a mental status exam and a standardized competency test.

[FN 3] The findings of Dr. Bindler and Dr. Velosa are not part of the record on appeal.

Dr. Willis testified that when she administered the competency test to [Petitioner], he did to appear to have any difficulty understanding the nature of, or his current position relative to the court proceedings. When asked if [Petitioner] understood how the proceedings were conducted, Dr. Willis responded, "No and yes." She explained: "He did get tripped up. He appeared to get tripped up on certain terms, and although he did provide answers, they were very simple concrete answers, and he appeared to not understand fully the plea process, but that is just one area." Dr. Willis concluded that defendant could rationally assist his attorney in his defense. In administering the mental status exam and interviewing [Petitioner], she looked for "any kind of psychoses and irrational thoughts, delusions, that kind of thing." Dr. Willis described what she found:

> "I found that he did not have any delusions. He reported to me symptoms that were consistent with drug use, and he was aware of these symptoms, which tells me it was not driven by a clinical disorder like schizophrenia or something like that. It was, you know, colored spots coming out of the wall, which is very consistent with someone that uses PCP and inhalants. And he also said that he heard voices, especially at night. And . . . it had gone down since he started his medication, they weren't bothering him anymore."

Dr. Willis testified that [Petitioner] was able to interact rationally with her. She did conduct formal testing of his memory, but part of the mental status exam addressed the issue. Dr. Willis explained:

> "My testing, when I'm looking for that, is I do it in the Mental Status Exam, which is when you're asking them to recall, for instance, words, you know, after awhile you ask them words again, and then they repeat them to you. So you're looking at that and then also the immediate memory, which is like digit span, saying numbers forward, saying numbers back.
>
> "And then what I do, and what many of my colleagues do, is we ask some questions in kind of a casual manner so they don't feel like they're being tested. So you just ask some questions about, you know, what did you have for breakfast this morning? And who - - you know, what did you do last night? How are you sleeping? Have you had visitors? When do they come? Those kinds of questions. And you go back, you know, recent and then a few months. He was able to describe a lot of details about everything back.
>
> "Q. [By the prosecutor]: Okay. So you didn't notice any major problems with his memory?
>
> "A. No, I don't think he - - he scored real high on remembering the digit - - his digits I think it was, but he did okay. It wasn't perfect.
>
> "Q. Okay. Anything about that that you could call into your mind a question as to whether or not he could rationally assist his counsel?
>
> "A. No."

The prosecution also called a number of lay witnesses, who worked at the county jail and thus came into regular contact with [Petitioner]. Among these, Danae Burgess, a licensed vocational nurse, testified she dispensed medicine to [Petitioner] during a period of approximately four years three months. [Petitioner] was able to communicate well with her, and he did not appear to have any memory problems but was able to remember things like when she had her days off.

Teddy Duncan, a deputy with the Tulare County Sheriff's Department, testified he was assigned to the main jail as a correctional deputy and had known [Petitioner] since February 2006. As a floor deputy, Deputy Duncan's job was to

supervise all the inmates on the floor. He came into regular contact with [Petitioner] through floor checks, which were conducted twice per hour. [Petitioner] exhibited no lack of memory of prior conversations. As an example, Deputy Duncan described how [Petitioner] had recently inquired about a chess board he had requested two weeks earlier from another deputy. Deputy Duncan had no problems communicating with [Petitioner], and he noticed [Petitioner] communicated well with other inmates. He never noticed any odd behavior from [Petitioner].

> Another correctional officer, Deputy Javier Garza, testified that he had known [Petitioner] for a few months and saw him on a regular basis. Deputy Garza had conversations with [Petitioner] about sports, and they talked about the playoffs and which teams would make it to the Super Bowl. Deputy Garza also talked to [Petitioner] about television shows. [Petitioner's] favorite show was the George Lopez show, which came on at 6:00 o'clock. [Petitioner] would ask the deputy what time it was and indicate he was waiting for the show to come on. Deputy Garza never noticed anything unusual about [Petitioner's] conversation or his behavior. [Petitioner] had no difficulty communicating.
>
> Sergeant Cory Jones, the administrative sergeant at the main jail, testified that his job involved keeping track of records, including grievance records. Sergeant Jones brought copies of nine grievances filed by [Petitioner] during his stay in jail. He explained that "[t]he purpose of the inmate grievance form is for the inmate to address their grievances if they have a problem - - a condition in the facility or something that's not going according to our policy or procedures, it's a way for them to address that with a higher authority." The sergeant described the grievance procedure as follows:
>
> > "Well, the procedure's very basic. The inmate asks the deputy for a grievance. The deputy is going to ask the inmate why he wants to file a grievance. Try to handle it at the lowest level. If the deputy can't handle it on the spot, he hands him a grievance form, and he fills the grievance out, gives it back to the deputy. The deputy then signs it, the inmate signs it, the deputy writes on his response either he can handle it or cannot handle it, and forward it on to the shift supervisor or myself."
>
> Sergeant Jones confirmed that each of [Petitioner's] grievances included a written complaint by [Petitioner], which was signed by [Petitioner] and a deputy. [Petitioner's] grievances, which were admitted into evidence, covered a time period from May 1, 2005, to November 5, 2007.
>
> The Trial Court's Ruling
>
> In its ruling, the trial court summarized the evidence presented at the trial and explained the rationale for its determination that defendant was competent to stand trial:
>
> > "Jurors are given CALCRIM instruction 3451 on issues involving a question of the present mental competency of the defendant. To be mental[ly] competent the defendant must:
> >
> > "1. Understand the nature and purpose of the criminal proceedings,
> >
> > "2. Assist in a rational manner his attorney in presenting

his defense, and

"3. Understand his status and condition in the criminal proceedings.

"There is [a] presumption of competency and the defendant must meet the burden of establishing his incompetency by a preponderance of the evidence.

"Three experts testified as to the defendant's competency along with a number of lay witnesses, each having spent time with the defendant since his arrest in a Tulare County Sheriff custodial facility. A number of exhibits were also received including grievances prepared by the defendant during his time in custody.

"It is clear from the evidence that defendant understands in a general but sufficient sense the nature and purpose of the criminal proceeding and further understands his status and condition in the criminal proceeding. The issue presented through the expert testimony addresses defendant's ability to assist in a rational manner his attorney in presenting his defense. [¶] . . . [¶]

"The two experts called on behalf of the defendant, Dr. Middleton and Dr. Glous, both agree that defendant had the inability to assist his attorney in a rational manner in presenting his defense. Dr. Middleton testified at length about the tests administered to [defendant] in an effort to determine his cognitive status and his executive function ability. H[is] conclusions are based on the results from a number of tests administered including a Cognitive Status Exam, with a score of 56 in the severely impaired range, Trial Making Tasks, a specific moderate to severely impaired range placing [defendant] in the 1[st] percentile and the Booklet Category Test with a score of 6 which places [defendant] between the 1st and 3rd percentile with impaired abstraction skills and impaired problem solving along with his interaction with [defendant] during one on one sessions.

"Dr. Middleton administered the Rey Complex Figure with Delay Test which tests perceptual motor skills. [Defendant's] test results were within normal limits however his delayed recall was impaired. His verbal IQ was reported by Dr. Middleton as 78 placing him in the 7th percentile although there were highs and lows [] on the 5 subjects indicative of brain injury as opposed to mental retardation. He found [defendant] not to be mentally retarded. He also concluded, based on testing, that [defendant] was not malingering. He concurred with Dr. Globus that his current mental condition was the result of organic brain injury resulting from multiple factors including head traumas, beatings, early childhood traumas and substance abuse. At the time of the first testing, which lasted about 3 hours, [defendant] was taking medications that are typically administered to control hallucinations, delusions and anger management. Dr. Middleton again tested him after he stopped taking the medications and his performance fell in most areas.

"Dr. Middleton was critical of the conclusions of Dr. Willis and was of the opinion that her examination was cursory in nature.

"While Dr. Middleton testified in great detail on the tests administered on the various dates he met with [defendant] and provided the court with his conclusions as to each test conducted both off and on medications, his conclusion chiefly relied on [defendant's] inability to process information received from the immediate past as well as from his long term memory to assist his attorney in his defense. He concluded after taking into consideration his entire assessment and testing results as well as the rescoring of testing done by Dr. Willis, that [defendant] was incompetent to stand trial.

"Dr. Globus, a psychiatrist, examined [defendant] on two occasions evaluating him for his mental status at the time of the alleged offense and for competency. He formed the opinion that he is not competent to stand trial. [Defendant] showed substantial evidence of brain damage, and a learning disorder, borderline intellectual functioning and dementia. Dr. Globus believes [defendant] has massive impairments in his executive functions that interfere with his ability to understand his status and condition in the case. He believes that [defendant] does not have the cognitive ability to make a decision as to whether he should testify at trial. A PET scan was done resulting in a confirmation of organic brain damage which substantiated the conclusions reached by both Dr. Globus and Dr. Middleton.

"The prosecution witnesses consisted of custodial officers and Dr. Willis, a psychologist, who examined the defendant on appointment by the court. Dr. Willis conducted a clinical interview[,] administered a mental status examination[,] reviewed the written reports of Dr. Globus, Dr. Bindler, Dr. Velosa and Dr. Middleton and concluded that [defendant] is competent to stand trial.

"The percipient witness[es] all testified that [their] interaction with [defendant] was not unusual. No memory problems were noticed by any witness. [Defendant] requested a chess board, however no witness testified as to his proficiency at chess. He filed nine grievances which required him to set forth the basis of the grievance. Each required a basi[c] level of understanding of the facts to support the grievance and the ability to set those facts forth in a written narrative fashion. [Defendant] did this nine times. He would discuss television programs and sports. One deputy discussed the [playoff] games in football and which team was likely to make it to the super [bowl]. He would be asked the time and reminded by [defendant] that George Lopez came on at 6:00 p.m.

"Considering all the evidence, the court finds that the defendant did not meet his burden of establishing his incompetence by a preponderance. He clearly understands the nature of the proceedings and understands the basi[c] functions of the participants in the trial process. While his cognitive ability is

> impaired, it is not impaired to the extent that he cannot assist his attorney in a rational manner in presenting his defense.

(LD 1 at 4-12.)

DISCUSSION

I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II. Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;
> or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly

established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merits precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

III. Insufficient Evidence to Support Finding of Competency to Stand Trial

Petitioner contends he was not competent to waive his rights and enter a guilty plea. The California Court of Appeal, Fifth Appellate District upheld the trial court's determine that Petitioner was competent to stand trial finding:

> *A. General Legal Principles*
>
> "Under California law, a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, subd. (a).)" (*People v. Young* (2005) 34 Cal.4th 1149, 1216; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1063; *People v. Garcia* (2008) 159 Cal.App.4th 163, 170 (*Garcia* ).) Our high court has recited the similar federal standard of incompetence as follows: "A defendant is incompetent to stand trial if he or she lacks a "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and ... a rational as well as a factual understanding of the proceedings against him.'" (*Dusky v. United States* (1964) 362 U.S. 402, 402 [(*Dusky*)]; see also *Godinez v. Moran* (1993) 509 U.S. 389, 399-400; § 1367; *People v. Stewart* (2004) 33 Cal.4th 425, 513.)" (*People v. Rogers* (2006) 39 Cal.4th 826, 846-847 (*Rogers* ).) "A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence." (*People v. Lawley* (2002) 27 Cal.4th 102, 131 (*Lawley*).)
>
> On appeal, a finding on the issue of a defendant's competence to stand trial "cannot be disturbed if there is any substantial and credible evidence in the record to support the finding." (*People v. Castro* (2000) 78 Cal.App.4th 1402, 1418; see also *Garcia, supra,* 159 Cal.App.4th at p. 171.) We view the evidence in the light most favorable to the verdict to determine if it supports the trial court's finding. (*People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*).) "'Evidence is substantial if it is reasonable, credible and of solid value.' [Citation.]" (*Lawley, supra,* 27 Cal.4th at p. 131.) "'In addition, a reviewing court generally gives great deference to a trial court's decision'" on the defendant's competence to stand trial. (*People v. Kaplan* (2007) 149 Cal.App.4th 372, 382-383, quoting *Marshall, supra,* at p. 33.)
>
> *B. Analysis*
>
> On the basis of a clinical interview, a mental status examination, and a competency test, the prosecution's expert, Dr. Willis, found that defendant was competent to stand trial. Dr. Willis's conclusion was bolstered by the testimony of jail staff, who had the opportunity to observe and interact with defendant on a regular basis and noticed none of the defects in memory or cognitive ability described by the defense experts. Of particular importance to the trial court's competency determination was the evidence that defendant filed nine grievances while he was in jail.
>
> The trial court's comments, both in its written ruling and during the competency proceedings, indicate that it viewed the grievances as tending to refute the defense experts' conclusion that defendant lacked sufficient memory and cognitive ability to understand the legal proceedings and to assist in his defense. The importance of this evidence to the trial court is reflected in the following exchange between defense counsel and the trial court during the hearing on January 9, 2009:

> "[DEFENSE COUNSEL]: But the memory function here is important also because not only is it a part of executive functioning, the fact that he can't remember the facts surrounding the crime.... He recalls the gun going off in his hand. What he says is it went off by accident. He remembers shooting the victim in this case. But repeatedly he says he couldn't remember why. Now if he can't remember why, he can't rationally aid me in some of the defenses that are available to a murder charge. He can't tell me whether or not we have-
>
> "THE COURT: Well, [defense counsel], I think the cases are clear that failure to recall the circumstances of the crime are not sufficient to establish that a defendant is incompetent to stand trial.
>
> "[DEFENSE COUNSEL]: But it's a factor this Court can use.
>
> "THE COURT: Well, there's no question about that, but the Court is more concerned, and I think the testimony of both Doctor Globus and Doctor Middleton had to do with the processing of information, and has to do with the ability to recall recent events, to be able to monitor and categorize testimony as it comes in during the speed of the trial. That's what they were talking about as I recall.
>
> "[DEFENSE COUNSEL]: That is-I will get to that. And the Court's correct, they did talk about short term memory and the ability to focus and concentrate. That's one of the phrases both of the doctors used, that-
>
> "THE COURT: Well, and *one of the key pieces of information that was received by way of evidence in this trial that was contrary to the expert testimony of those two witnesses were the nine grievances.* As I pointed out in my tentative ruling, *those grievances required an ability to understand the nature of the grievance process, an ability to recall the events that led to the grievance, and an ability to put that down on paper in front of the deputy as the grievance process required.* And [defendant] did that at various levels on nine different occasions. That was contrary, that really is contrary to the conclusions that were reached by the doctors." (Italics added.)

We see no basis in the record for rejecting the trial court's assessment of the grievances and the inferences the court drew regarding defendant's competency based on his ability to recollect past events and to describe them coherently in a complaint written by him in the presence of a correctional officer. Although defendant asserts in his opening brief that "[the grievances] were simple, structured procedures that did not involve complex thinking skills," he cites no evidence to support these assertions, which mirror the assertions put forth by defense counsel at the January 9, 2009 hearing. The trial court, which had an opportunity to review the grievances, clearly rejected defendant's interpretation of the grievances as it was entitled to do.

We note, however, the grievances were not the only evidence that appeared to contradict the defense experts' testimony concerning defendant's memory deficits. At one point, Dr. Globus testified that when he administered defendant a mental status exam, there were many things defendant was unable to remember, including

what he ate for breakfast and dinner the night before. Dr. Willis, on the other hand, testified that when she asked defendant the same types of questions, he *was* able to remember and describe many details back to her. The day-to-day observations of jail staff likewise contradicted Dr. Globus's observations. Deputy Duncan testified that defendant reminded him about a request for a chess board defendant had made two weeks earlier, Nurse Burgess testified that defendant was able to remember which days she had off, and Deputy Garza testified that defendant could remember what teams were competing for the Super Bowl. Deputy Garza further testified that he agreed with defendant's opinion that the Patriots “would go all the way” because that team was doing well that year. These and similar observations by prosecution witnesses were inconsistent with Dr. Globus's observation that defendant's memory was so impaired he could not remember what he ate on a particular day.

In short, to those who observed defendant on a regular basis, he appeared to function at a much higher level than the defense experts' testimony suggested he should.

We also reject defendant's assertions that Dr. Willis's opinion that defendant was competent to stand trial did not constitute substantial evidence because she failed to conduct a thorough examination of his condition, her conclusions concerning his competency were merely perfunctory, or that she failed to address factors relevant to the *Dusky* or federal standard of competency. When she testified, Dr. Willis was an unchallenged expert in the field, who had administered approximately 200 competency examinations to inmates. There is no indication that she failed to administer the examination correctly in defendant's case or that she failed to properly conduct her clinical examination and mental status examination of defendant. Indeed, as noted above, she asked defendant questions during the mental status examination that were similar to those asked by Dr. Globus. Her testimony went directly to the factors considered pertinent under both the state and federal tests of competency, including defendant's ability to rationally assist his attorney and his understanding of the proceedings against him.

It is true that Dr. Middleton disagreed with Dr. Willis's competency determination and that, when he reviewed her report, which noted defendant's answers to the various questions she put to defendant, Dr. Middleton concluded that he would have found defendant incompetent to stand trial. Dr. Middleton testified that he “re-score[d]” the competency test administered by Dr. Willis and concluded defendant was competent in only four of the 14 areas of competency covered by the test. Dr. Middleton noted that Dr. Willis “didn't provide any scoring of the test” but “merely put ‘pass’ at the end and circled it.”

However, no evidence was introduced to show that Dr. Willis incorrectly administered the test or that scoring of each individual area of competency was required. Moreover, Dr. Middleton's testimony suggests that Dr. Willis duly noted defendants' responses in her report and belies defendant's assertions that her examinations of him were cursory in nature. The fact the two doctors reached different conclusions does not invalidate Dr. Willis's conclusion. For reasons discussed above, the trial court could reasonably reject Dr. Middleton's conclusion that defendant was incompetent to stand trial, and agree with Dr. Willis's assessment, which was supported by the evidence of the grievances defendant filed and the observations of lay witnesses who interacted with defendant on a regular basis.

We also reject defendant's assertions, based on few brief excerpts from Dr. Willis's testimony, that the prosecution's expert actually found that defendant lacked

understanding of the legal proceedings against him and that he was therefore incompetent to stand trial. Dr. Willis merely stated defendant got "tripped up on certain terms" and did not understand "fully" the plea process. As she pointed out, this was "just one area" of the competency evaluation, and there was nothing in her testimony to suggest that defendant could not understand the plea process if it were explained to him.

> Similarly, there is no evidence to support defendant's assertion that Dr. Willis's "report stated that [defendant] did not understand the role of a jury, a witness, the judge, the district attorney, a court or a judge trial, or a plea bargain." The testimony he cites is that of Dr. Middleton describing *his* assessment of defendant's answers, reflected in Dr. Willis's report, to questions regarding the fourth area on the competency test, which was entitled "Appraisal of Functions of Courtroom Participants." Again, this was just one of 14 areas of competency tested and the fact Dr. Middleton assessed defendant negatively in this area does not in any way invalidate Dr. Willis's overall conclusion that defendant was competent to stand trial.
>
> Finally, *People v. Samuel* (1981) 29 Cal.3d 489 does not help defendant. In that case, "five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified on [defendant's] behalf. In addition, four psychiatric reports were admitted into evidence. Without exception, each witness and every report concluded that throughout the period during which the declarant observed the defendant, the latter was incompetent to stand trial." (*Id.* at pp. 497-498.) In contrast, here the evidence that defendant was incompetent to stand trial was not "persuasive and virtually uncontradicted" (*id.* at p. 506) and the trial court could reasonably reject the defense experts' opinion and conclude and that defendant was competent to stand trial.

(LD 1 at 12-17.)

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. Medina v. California, 505 U.S. 437, 439 (1992); Drope v. Missouri, 420 U.S. 162, 171-173 (1975). A defendant is incompetent if "he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." Drope, 420 U.S. at 171. If the evidence raises a bona fide doubt about the defendant's competence, due process requires a full competency hearing to be held, to be ordered sua sponte by the judge. Pate v. Robinson, 383 U.S. 375, 385 (1966). The applicable test for competency is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960).

The burden of establishing mental incompetence rests with the petitioner. Boag v. Raines,

769 F.2d 1341, 1343 (9th Cir. 1985); McKinney v. United States, 487 F.2d 948, 949 (9th Cir. 1973). In findings facts and determining credibility, a trial court is free to assign greater weight to the findings of government experts than to the opposing opinions of defense experts. See United States v. Gaselum-Almeida, 298 F.3d 1167, 1172 (9th Cir. 2002). A "state court's determination that a defendant is competent to stand trial is a factual determination which must be given deference when reviewed in federal court on a petition for habeas corpus." Maggio v. Fulford, 462 U.S. 111 (1983) (per curiam); 28 U.S.C. § 2254(d)(2) & (e)(1). Therefore, a federal court may overturn a state court competency finding only if rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, the state appellate court explained that the trial court's competency determination was supported by the evidence of Petitioner's ability to file nine grievances during his imprisonment prior to trial, his ability to understand and communicate with several correctional staff, and Dr. Willis's assessment that Petitioner had the ability to rationally assist his attorney and understand the proceedings against him. The grievances filed by Petitioner required an ability to organize and collect the facts to support his claim and to set forth those facts in a narrative fashion, and Petitioner was able to do so nine times. Although Drs. Middleton and Globus found Petitioner to be incompetent to stand trial, there was contrary testimony from Dr. Willis and several lay witnesses who interacted with Petitioner on a regular basis. More specially, Petitioner requested to play a game he had made two weeks earlier, remembered the days in which the nurse worked, and remembered the teams who were competing in the Super Bowl. In addition, Dr. Globus's assessment that Petitioner was not able to remember many things, including what he ate for breakfast was contradicted by Dr. Willis's testimony. When many of the same questions were posed by Dr. Willis, Petitioner was able to remember many details and describe things back to her. Given this evidence, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: January 25, 2012** **/s/ Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE